1
2
3
4                    IN THE UNITED STATES DISTRICT COURT
5                       FOR THE DISTRICT OF ARIZONA
6
7    GINA GAIL CELAYA                    )
                                         )
8              Petitioner,               )      No.   CV 01-622-TUC-DCB (BPV)
     vs.                                 )
9                                        )
                                         )      **ORDER**
10   DORA SCHRIRO, et al.,               )
                                         )
11             Respondents.              )
     _____)
12
13           On November 28, 2001, Petitioner, an inmate confined in the Arizona State

14   Prisons Complex in Perryville, Arizona, filed a *pro se* Petition for Writ of Habeas

15   Corpus by a Person in State Custody, pursuant to Title 28, U.S.C. § 2254.  (Doc. No.

16   1.)[1]  A Second Amended Petition ("Petition") was filed on September 27, 2007.  (Doc.

17   No. 34.)  Respondents filed an Answer to the Petition on March 3, 2008.   (Doc. No.

18   44.)  Petitioner filed a Reply on June 16, 2008.  (Doc. No. 49.)

19           Pursuant to the Rules of Practice of this Court, this matter was referred to

20   Magistrate Judge Bernardo P. Velasco for a Report and Recommendation.

21           For the reasons discussed below, the Magistrate Judge recommends that the

22   District Court enter an order DISMISSING Grounds Two and Three, and GRANTING

     RELIEF as to Ground One.
23
     **I.    FACTUAL AND PROCEDURAL BACKGROUND**
24
             A.      Trial Court Proceedings
25
             The trial court briefly summarized the background and facts of the state court
26
     proceedings as follows:
27

28   _____
             [1] "Doc. No." refers to documents in this Court's file.

During the late night hours of December 21, 1992/early morning hours of December 22, 1992, Trinidad Lopez, age 51, was shot by Miss Celaya, then 14 years of age, and he died as a result of injuries sustained in the shooting. The medical examiner determined that Trinidad Lopez died of blood loss as a result of a single gunshot wound to his upper right buttocks area. (RT 9/27/94, ¶. 36-40)

The State's theory was that Miss Celaya shot Mr. Lopez during the course of an armed robbery and carjacking. RT 9/24/94, 146-14. Gina Celaya's defense was that she shot Trinidad Lopez in self-defense during a struggle in which Trinidad Lopez sexually assaulted her. (RT 9/27/94, ¶. 99-109)

On Tuesday evening, December 22, 1992 at approximately 8:00 p.m. the victim's family made a missing person report to the Tucson Police Department. Shortly thereafter, Mr. Lopez' vehicle was involved in an accident in South Tucson. (RT 1/4/93 Juvenile Probable Cause Hearing, page 21). At that time Baby Laguna, the defendant's friend, was driving the vehicle, the defendant was seated in the passenger side of the vehicle, and in the camper back area were young teenage girls April Ornelas, Sonya Levya and Gloria Espinosa, all of whom were friends of Gina Celaya. While the girls were "cruising" in the decedent's vehicle, the victim's daughter and her husband saw the vehicle and gave chase. Baby Laguna fired shots at the family's pursuing vehicle. Subsequently, Ms. Laguna crashed the vehicle. (RT 9/22/94 second day of jury trial). The girls fled to Rebecca Antone's house. (RT 9/22/99 page 75). Testimony at trial by Ms. Espinosa, Ms. Leyva, Ms. Ornelas and Ms. Antone indicated that Gina Celaya told them that she had killed Trinidad Lopez. The three girls and two of their parents went to the police station to report the incident and what they had been told.

Efforts to locate Mr. Lopez' body were unsuccessful. Subsequently, a transient, Vernon Osborne, discovered Mr. Lopez' body in the desert near the Los Reales Landfill on December 24, 1992. Mr. Osborne flagged down a vehicle, went to a convenience store and contacted the police.

Ms. Celaya was ultimately arrested for the homicide of Mr. Lopez. On January 4 and 12, 1993 Judge Collins conducted a Probable Cause Hearing at the Juvenile Court. The Court on January 4, 1993 appointed an attorney to represent Baby Laguna. (RT 1/4/93 pages 5-6).

Thereafter, on April 1, 13 and 14, the Court conducted a lengthy Amenability Hearing. The defendant was ultimately transferred to adult court to face charges.

Defendant presented numerous motions which were heard and resolved by the Court. On September 21 through September 29, 1994 the defendant was tried before a jury for First Degree Murder and Armed Robbery. The defendant was convicted of First Degree Murder and Armed Robbery. Th[e] Court sentenced the defendant to a term of 25 years to life on the First Degree Murder Charge and a consecutive term of 10.5 years on the Armed Robbery.

(Answer, Ex. D: M.E. 11/5/99, at 2-3.)

B.     Appeal

The Arizona Court of Appeals affirmed Petitioner's conviction and sentence on direct appeal. (Answer, Ex. A.) The court of appeals addressed Petitioner's arguments, rejecting Petitioner's contentions that (1) the trial court should have allowed Petitioner's taped statement's to be played to the jury; (2) the prosecutor engaged in misconduct in saying that the defense could have introduced Petitioner's prior statements; (3) the trial court improperly limited defense efforts to prove the violent character of the decedent in support of defendant's claim of self-defense; (4) the trial court should have permitted impeachment of a prosecution witness by allowing inquiry into her activities in inducing another to engage in prostitution; (5) Petitioner's pretrial statements were involuntary; and (6) the consecutive sentences in the case violated the double-jeopardy clause or A.R.S. § 13-116, or that the imposition of the sentences constituted cruel and unusual punishment. (*Id.*)

Petitioner appealed that decision to the Arizona Supreme Court, and on September 18, 1996, that court denied review. (*See* Answer, at 2; Appendix to Memorandum of Points and Authorities to Petition for Writ of Habeas Corpus (hereafter "Appendix"), Ex. B.)

C.     First Petition for Post-Conviction Relief

Petitioner's uncontested assertion is that the notice of post conviction relief was filed on October 7, 1996. (*See* Second Amended Petition at 3.) Petitioner's first petition for post-conviction relief was filed on August 3, 1998. (*See* Appendix, Ex. C, at 1.) Petitioner presented the following issues in her petition: (1) Petitioner's conviction and sentence were in violation of the U.S. and Arizona Constitutions because two members of the Tucson Police Department committed perjury at her trial; (2) The testimony of Vernon Osborne at the Rule 32 hearing constitutes newly-discovered evidence; (3) The recantation of Magdalene "Baby" Laguna constitutes

- 3 -

newly-discovered evidence; and (4) *State v. Dunlap*, 187 Ariz. 441 (App. 1996) constitutes a significant change in the law. (*Id*. at 3-4.) The trial court conducted an evidentiary hearing and thereafter issued a minute entry on November 5, 1999, denying relief on all four issues. (*Id*. at 2)

On January 10, 2000, Petitioner filed a petition for review with the Arizona Court of Appeals to review the trial court's denial of post-conviction relief. (*See* Second Amended Petition, at 3) The court of appeals granted review but denied relief on October 17, 2000. (Appendix, Ex. D.) No motion for reconsideration or petition for review from that decision was filed. The Arizona Court of Appeals issued its mandate on November 30, 2000. (Appendix, Ex. E.)

D.     First Federal Habeas Petition and Amended Petition

Petitioner filed her first petition for post-conviction relief in District Court on November 28, 2001. (Doc. No. 1.) The petition contained three exhausted claims, and one unexhausted ineffective assistance of counsel claim. (*Id*.) The District Court subsequently dismissed the petition without prejudice, with leave to file an amended petition deleting the unexhausted claim, and held the federal habeas proceedings in abeyance until after Petitioner exhausted the unexhausted claim. (Doc. No. 11.) Petitioner filed the First Amended Petition on January 30, 2002. (Doc. No. 13.) The Amended Petition was held in abeyance while Petitioner sought exhaustion of her ineffective assistance of counsel claims in state court. (Doc. No. 15-28.)

E.     Second Petition for Post-Conviction Relief

On November 23, 2001, Petitioner filed her second notice of post-conviction relief in state court. (*See* Second Amended Petition, Supp. Ex. 8, at 6.) On February 20, 2002, Petitioner filed her second petition for post-conviction relief, raising claims of ineffective assistance of counsel and one claim, in the alternative, of a change in the law. (Second Amended Petition, Supp. Ex. 1.)

- 4 -

On October 24, 2003, the trial court denied the petition with regard to all assertions of ineffective assistance of trial counsel, finding the claims precluded. (*Id*., Supp. Ex. 8, at 13.) The trial court addressed each claim nonetheless, and made extensive findings of fact as to each claim "so that there [would] be no questions as to this Court's Findings and Conclusions in the event this issue is raised yet again." (*Id*. at 14.) The trial court concluded that trial counsel was not ineffective with regard to all issues raised. (*Id*. at 36.) The trial court granted relief with regard to the claim asserted in the alternative; concluding that there had been a significant change in the law, and that the court had been influenced by the State's assertion that there was a presumption that the Court impose consecutive sentences. (*Id*. at 38.) Accordingly, the trial court resentenced Petitioner to concurrent, rather than consecutive, sentences of life imprisonment without the possibility of release for 25 years and 10.5 years imprisonment, for first degree murder and armed robbery, respectively. (*Id*., Supp. Ex. 8, at 38, and Supp. Ex. 9, at 2-3.)

On October 7, 2004, Petitioner filed a petition for review with the Arizona Court of Appeals, along with a motion to accept the oversized petition for review, asserting that the trial court abused its discretion by finding that trial counsel did not provide ineffective assistance of counsel. (*Id*., Supp. Ex. 10.11) The court of appeals denied the motion to accept the oversized petition, and withdrew the petition for review, returned the petition to counsel, with leave to refile a petition in compliance with Rule 32.9(c)(1), Ariz. R. Crim. P. (*Id*., Supp. Ex. 12.) A revised petition was submitted on January 13, 2004. (*Id*., Supp. Ex. 13.) In a memorandum decision filed August 22, 2006, the court of appeals granted review, but denied relief. (*Id*., Supp. Ex. 14.) The court of appeals found the ineffective assistance of counsel claims "indeed precluded in this second post-conviction proceeding because they could have been but were not raised in her first Rule 32 proceeding." (*Id*., Supp. Ex. 14, at 3.) Although the appellate court questioned the trial court's finding that the record supported the finding that

Petitioner personally waived her claims of ineffective assistance "after being advised of the necessity to raise them by her appellate and Rule 32 counsel both orally and in writing"; the appellate court did not reach that question because it rejected Petitioner's assertion that waiver of a claim of ineffective assistance of counsel under Arizona law requires an informed, voluntary personal waiver. (*Id.*)

Petitioner filed a petition for review of the appellate court's decision with the Arizona Supreme Court, urging the supreme court to find that the claims were not precluded unless they were knowingly, intelligently and voluntarily waived. (*Id.*, Supp. Ex. 15, at 7) The supreme court denied review on June 5, 2007. (*Id.*, Supp Ex. 16.)

F.  Second Amended Federal Habeas Petition

On September 26, 2007, the District Court, noting that the appellate court had issued the mandate on August 2, 2007, lifted the stay and returned this case to the Court's active docket. (Doc. No. 33.) The Court further granted Petitioner's motion to amend the petition and ordered the Clerk of Court to file the lodged Second Amended Petition. (*Id.*) The amended petition had the effect of reinserting the newly exhausted claim, which directly related back to the original petition, and deleting the moot claim regarding concurrent sentences. (*Id.*)

The Second Amended Petition along with Supplemental Exhibits 1 through 21 was filed by the Clerk of Court on September 27, 2007. (Doc. No. 34-38.) Respondents filed an Answer with Exhibits A through J attached on March 3, 2008. (Doc. No. 44.) A Reply with Exhibits A through N was filed by Petitioner on June 16, 2008 (Doc. No. 49.)

II.  **DISCUSSION**

A.  Standard of Review

Because Petitioner filed her petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("AEDPA").

B.     Statute of Limitations

A one year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  28 U.S.C. § 2244(d)(1).  Under the AEDPA, a state prisoner must generally file a petition for writ of habeas corpus within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review [.]" 28 U.S.C. § 2244(d)(1)(A).  "The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation[.]" 28 U.S.C. § 2244(d)(2).

C.     Exhaustion of State Remedies

Before a federal court may review a petitioner's claims on the merits, a petitioner must exhaust his state remedies, which means he must have presented in state court every claim raised in his federal habeas petition.  *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (a state prisoner in a federal habeas action must exhaust his federal claims in the state courts "by invoking one complete round of the State's established appellate review process" before he may submit those claims in a federal habeas petition); *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999).  Exhaustion of state remedies is required in order to give the state the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted). In order to provide a state with this necessary opportunity, "the prisoner must fairly present his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Id.*  (internal quotation marks and citations omitted).

A claim is "fairly presented" if the petitioner has described the operative facts and legal theories on which his claim is based.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th

- 7 -

Cir. 2001). In state court, the petitioner must describe not only the operative facts but also the asserted constitutional principle, for if "state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). A petitioner does not ordinarily "fairly present" a federal claim to a state court if that court must read beyond a petition, brief, or similar papers to find material that will alert it to the presence of a federal claim. *Baldwin*, 541 U.S. at 32-33 (rejecting contention that petition fairly presented federal ineffective assistance of counsel claim because "ineffective" is a term of art in Oregon that refers only to federal law claims, since petitioner failed to demonstrate that state law uses "ineffective assistance" as referring only to federal law rather than a similar state law claim); *Harless*, 459 U.S. at 6 (holding that mere presentation of facts necessary to support a federal claim, or presentation of state claim similar to federal claim, is insufficient; petitioner must fairly present the substance of the federal claim); *Hiivala v. Wood*, 195 F.3d 1098 (9th Cir. 1999) (holding that petitioner failed to exhaust federal due process issue in state court because petitioner presented claim in state court only on state grounds); *Gatlin v. Madding*, 189 F.3d 882 (9th Cir. 1999) (holding that petitioner failed to "fairly present" federal claim to state courts where he failed to identify the federal legal basis for his claim).

In Arizona, exhaustion is satisfied if a claim is presented to the Arizona Court of Appeals. A discretionary petition for review to the Supreme Court of Arizona is not necessary for purposes of federal exhaustion. *Swoopes*, 196 F.3d at 1010; *State v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989) (in non-capital cases, state remedies are exhausted by review by the court of appeals); *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005) (quoting *Swoopes* for assertion that in cases not carrying a life sentence or the death

penalty, "claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them").

The Ninth Circuit Court of Appeals has explained the distinction between exhaustion and procedural default as follows:

> The exhaustion requirement is distinct from the procedural default rule. The exhaustion doctrine applies when the state court has never been presented with an opportunity to consider a petitioner's claims and that opportunity may still be available to the petitioner under state law. In contrast, the procedural default rule barring consideration of a federal claim applies only when a state court has been presented with the federal claim, but declined to reach the issue for procedural reasons, or if it is clear that the state court would hold the claim procedurally barred. Thus, in some circumstances, a petitioner's failure to exhaust a federal claim in state court may *cause* a procedural default. A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer "available" to him. A federal claim that is defaulted in state court pursuant to an adequate and independent procedural bar may not be considered in federal court unless the petitioner demonstrates cause and prejudice for the default, or shows that a fundamental miscarriage of justice would result if the federal court refused to consider the claim.

*Cassett v. Stewart*, 406 F.3d 614, 621 n.5 (9th Cir. 2005) (internal quotation marks and citations omitted). In other words, a habeas petitioner's claims may be precluded from federal review in either of two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, the claim may be procedurally defaulted in federal court if the petitioner failed to present the claim in a necessary state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id*. at 735 n.1. This is often referred to as "technical" exhaustion, because although the claim was not actually exhausted in state court, the petitioner no longer has an available state remedy.

If a claim is procedurally defaulted, it may not be considered by a federal court unless the petitioner demonstrates cause and prejudice to excuse the default in state court, or demonstrates that a fundamental miscarriage of justice would result. *Id*. at 750;

*Sawyer v. Whitley*, 505 U.S. 333, 338-339 (1992). If a claim has never been fairly presented to the state court, a federal habeas court may determine whether state remedies remain available. *See Harris v. Reed*, 489 U.S. 255, 269-70 (1989); *Teague v. Lane*, 489 U.S. 288, 298-99 (1989); *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989).

Cause is defined as a "legitimate excuse for the default," and prejudice is defined as "actual harm resulting from the alleged constitutional violation." *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991); *see Murray v. Carrier*, 477 U.S. 478, 488 (1986) (a showing of cause requires a petitioner to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule"). Prejudice need not be addressed if a petitioner fails to show cause. *Thomas*, 945 F.2d at 1123 n.10. To bring himself within the narrow class of cases that implicate a fundamental miscarriage of justice, a petitioner "must come forward with sufficient proof of his actual innocence," *Sistrunk v. Armenakis*, 292 F.3d 669, 672-73 (9th Cir. 2002) (internal quotation marks and citations omitted), which can be shown when "a petitioner 'presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Id.* at 673 (quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995)).

D.     Standard of Review: Merits

Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reduc[ing] delays in the execution of state and federal criminal sentences.' " *Schriro v. Landrigan*, 550 U.S. 465, 473, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's " 'highly deferential standard for evaluating state-court rulings' ... demands that

- 10 -

state-court decisions be given the benefit of the doubt ." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh*, 521 U.S. at 333 n. 7).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (*citing Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient

legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S.Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court cases] to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's

decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ( *Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-474; *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no

state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## III.    ANALYSIS

### A.    Timeliness

Respondents submit that the Petition exceeded the 1-year statute of limitations and there is no statutory or equitable basis for tolling the limitations period. (*See* Answer, at 5-8.)

Respondents assert that Petitioner's conviction and sentence became final on October 17, 2000, when the Arizona Court of Appeals denied relief from the trial court's denial of post-conviction relief. Respondents further assert that the statute of limitations began to run the next day, and therefore, to be timely under the AEDPA, Petitioner would have had to file the present petition by October 18, 2001.[2]  Under Respondents calculation, Petitioner's federal petition, filed on November 28, 2001, is untimely, absent statutory or equitable tolling, by 41 days.

Petitioner responds that the correct date to begin calculating the AEDPA limitations period is the date that the court of appeals issued its mandate, November 30, 2000.  Thus, to be timely under this calculation, Petitioner would have had to file the present petition by November 30, 2001.  Accordingly, Petitioner's original petition,

---

[2]  Although not essential to this determination, or the timeliness calculations, Respondents have miscalculated the time period for timely filing even assuming that the clock starts the date that the court of appeals denied relief, October 17, 2000.  The limitations period expires a year after the judgment becomes final, not a year and a day, as stated in Respondents Answer (Doc. No. 44 at 5.)  *See Patterson v. Stewart*, 251 F.3d 1243, 1247 (9th Cir. 2001).  Thus the filing deadline would be October 17, 2001, not October 18, 2001, as asserted by Respondents.

filed on November 28, 2001, is timely even without regard to statutory or equitable tolling of the limitations period.

### 1. Date on which conviction and sentence became final.

Petitioner's conviction became final on December 17, 1996, 90 days after her direct appeal was denied by the Arizona Supreme Court on September 18, 1996, when the time for filing a petition for a writ of certiorari from the United States Supreme Court expired. *See* 28 U.S.C. § 2244(d)(1)(A); *See Wixom v. Washington*, 264 F.3d 894, 897 (9th Cir. 2001).

### 2. Statutory Tolling

The limitations period was tolled immediately, however, by the pendency of Petitioner's petition for post conviction relief. *See* 28 U.S.C. § 2244(d)(2). The notice of post-conviction relief had been filed in the trial court on October 7, 1996, prior to the conclusion of direct review. There was no gap between the conclusion of direct review, and Petitioner's properly filed application for state post-conviction review. Thus, the issue is not when direct review became final under § 2244(d)(1)(A), rather, this Court must determine how long Petitioner's petition for post-conviction relief was "pending" for purposes of tolling the limitations period pursuant to § 2244(d)(2).

Until an application for state post-conviction relief has achieved final resolution through the State's post-conviction procedure it remains "pending." *See Carey v. Saffold*, 536 U.S. 214, 219-20 (2002); *See also Hemmerle v. Schriro*, 495 F.3d 1069, 1077 (9th Cir. 2007). In *Carey*, the Supreme Court interpreted the word "pending" and explained that, "until the application [for post-conviction or other collateral review] has achieved final resolution through the State's post-conviction procedures, by definition, it remains 'pending.' " *Carey*, 536 U.S, 214 at 220. To do so, the Court looked to the definition of "pending" as "in continuance" or "not yet decided." *Id*. at 219 (quoting Webster's Third New International Dictionary 1669 (1993)).

Respondents assert that the thirty days following the denial of Petitioner's petition for review to the court of appeals, the time during which Petitioner could have, but did not, seek review in the Arizona Supreme Court, is not tolled, because there is no longer any action "pending" in the state courts. Respondents cite *Bunney v. Mitchell*, 241 F.3d 1151 (9th Cir. 2001) (*Bunney I*) in support of this argument.

In *Bunney I*, the Ninth Circuit held that § 2244(d)(2) does not toll the statute of limitations for the 90-day period following the denial of a state-court petition because a petition for certiorari in the United States Supreme Court is not State post-conviction review or other State collateral review. *Id.* at 1156. Although the Ninth Circuit did note, as Respondents assert, that Congress did not include anything comparable to the phrase found in § 2244(d)(1) "or the expiration of the time for seeking such review" in the subsection that applies to state post-conviction petitions, the Ninth Circuit explicitly limited this holding to the period of time during which Petitioner could have sought certiorari in the United States Supreme Court. *Id.* The United States Supreme Court has since confirmed that a petition is not pending while a Petitioner is seeking further *federal review* of an application for state court relief. *Lawrence v. Florida*, 549 U.S. 327 (2007) (emphasis added).

The opinion in *Bunney I*, however, was withdrawn when the Ninth Circuit expressed its uncertainty over when a summary denial of a petition for writ of habeas corpus before the California Supreme Court becomes final. The court noted that there were two plausible ways to read the rules at issue in that case: Rule 24(a), in which a decision of any kind becomes final 30 days after filing and Rule 27(a), in which the California Supreme Court may grant a rehearing after its own decision in any cause, respectively. The Ninth Circuit noted that Rule 24(a) could be read by itself and literally, resulting in a decision of any kind becoming final 30 days after filing. Alternatively, the two rules could be read together and construed as not encompassing a summary denial of a petition for writ of habeas corpus because a summary denial

would not encompass the determination of a "cause." Thus, the specific interpretations of the state rules at issue were directly determinative to the Ninth Circuit's determination to withdraw its opinion in *Bunney I*. Accordingly, the Ninth Circuit requested that the Supreme Court of California accept certification and resolve the question. *Bunney v. Mitchell*, 249 F.3d 1188, 1191 (9th Cir. 2001) (*Bunney II*). The California Supreme Court declined, and the Ninth Circuit resolved the issue by relying on its own interpretation of Rule 24(a) and state decisions in determining that the denial of the petitioner's state-court habeas petition was not final for 30 days, and found the federal petition in that case timely. *Bunney v. Mitchell*, 262 F.3d 973 (9th Cir. 2001). The facts in *Bunney* are distinguishable from the facts of this case, however, as they rely on a different set of state procedural rules. Thus, contrary to Respondent's assertion, the holding in *Bunney* is inapplicable to this case, except to the extent it reinforces the conclusion that a federal court should look to the rules of the state to determine when a state decision on a petition is "final" to determine when the petition is still pending under § 2244(d)(2).[3] Although the Ninth Circuit has addressed finality issues similar to the one before this Court, it has not decided the issue in a case where it has been fully argued and considered in a factual and procedural posture equivalent to the present case.

In *Wixom v. Washington*, 264 F.3d 894 (9th Cir. 2001), the issue was whether the petitioner's judgment became final at the time the Washington Court of Appeals denied his motion to modify the commissioner's ruling, or upon issuance of the mandate. *Id.* at 896. The petitioner argued that the one-year limitations period did not

---

[3]   Conversely, section 2244(d)(1)(A), by virtue of inclusion of the words "by the conclusion of direct review or the expiration of the time for seeking such review" makes it clear that finality is to be determined by reference to a uniform federal rule. *See Hemmerle*, 495 F.3d 1069, 1074 (2007) (citing *Clay v. United States*, 537 U.S. 522, 531 (2003)).

begin to run until the mandate had issued. *Id*. at 897.  Relying on Washington procedural rules, the Ninth Circuit held that the Washington appellate court's denial of Wixom's motion to modify the judgment, and not the mandate, concluded review. *Id*. at 897-98.  Washington state procedural rules provided that a "decision terminating review" by the Washington appellate court "unconditionally conclude[d] direct review." *Id*. at 898. The denial of a motion to modify the judgment was a "decision terminating review" under Washington law.  *Id*.  Accordingly, the Ninth Circuit determined that because the decision, and not the mandate, concluded direct review under Washington law, the decision commenced the one-year limitations period imposed by the AEDPA. *Id*.

*Wixom* is clearly distinguishable from this case, as, in Arizona, there is no equivalent to the Washington Rules that formed the basis for the *Wixom* decision. There is no similar Arizona rule stating when an appellate case ends.

In another distinguishable case, the Ninth Circuit court in *Hemmerle* was faced with the dilemma of determining when, under § 2244(d)(2), a petition for post-conviction relief was finally "determined"and the petitioner's state post-conviction proceedings became final.  *Hemmerle v. Schriro*, 495 F.3d 1069, 1077 (9th Cir. 2007). The petitioner proffered an argument that a letter issued after the Supreme Court's denial of review from the clerk of the court of appeals, notably not a mandate, but instead a letter which facilitated the performance of a ministerial function of returning the record to the trial court pursuant to Rule 32.9(h) was (1) a mandate, and (2) the date on which the proceedings became final.  *Id*. at 1077.  The Ninth Circuit rejected the arguments, noting that Rule 32.9(h) states that "[w]hen the matter is determined, the clerk of the appellate court shall return the record to the appropriate trial court for retention according to law" and  thus, the letter was not a mandate, rather, something that occurs "when the matter is determined' and that "the matter was determined by the Arizona Supreme Court on [the date] when it denied review" because there was

"nothing left for it do" and thus "nothing remained 'pending' for purposes of § 2244(d)(2)." *Id.* at 1077. This case is factually distinct from *Hemmerle*. Unlike the so-called "mandate" in *Hemmerle*, the mandate issued in the present case was a mandate issued commanding the trial court that such proceedings be had in the case as required to comply with the memorandum decision of the court of appeals. (Answer, Ex. F.) The Ninth Circuit in *Hemmerle* did not have an actual mandate before it, specifically finding that the letter referred to by petitioner as a "mandate" was "not equivalent to the issuance of the mandate." *Hemmerle*, 495 F.3d at 1077. The Ninth Circuit in *Hemmerle* specifically acknowledged that there was no requirement that the appeals court wait a certain amount of time before sending the record back, that the ministerial function was to be performed, pursuant to Rule 32.9(h) only after the "matter is determined." *Id.* Thus, the Ninth Circuit's decision in *Hemmerle*, that the matter was "determined" by the Arizona Supreme Court on the date it denied review did not settle the issue which is squarely before this Court: Under Arizona law, does a petition for post-conviction relief remain pending, for purposes of statutory tolling under 28 U.S.C. § 2244(d)(2), until the date the appellate court issues its decision, or the date the court issues its mandate?

Under Arizona law, appellate review in a criminal case is not final until the mandate has issued.[4] Arizona courts have expressly stated that a judgment is not final until the mandate has issued. "The decision of the appellate court does not become final until the order (or mandate) is filed." *State v. Ward*, 120 Ariz. 413, 415 (1978); *see also Borrow v. El Dorado Lodge, Inc.*, 75 Ariz. 218, 220 (1953) (stating appellate court's

---

[4] Under Arizona Rules of Criminal Procedure, "[i]f there has been no motion for reconsideration and no petition for review filed, the clerk of the Court of Appeals shall issue the mandate at the expiration of the time for the filing of such motion or petition." Ariz. R. Crim. P. 31.23(a)(l).

judgment becomes effective on "the date of the issuance of the mandate"); *State v. Sepulveda*, 201 Ariz. 158, 159 n.2 (App. 2001) ("A conviction becomes final upon the issuance of the mandate affirming the conviction on direct appeal and the expiration of the time for seeking certiorari in the United States Supreme Court."); *State v. Dalglish*, 183 Ariz. 188, 190 (App. 1995) ("We conclude that Petitioner's case was final on ... the date the Arizona Supreme court issued its mandate."); *State v. Jones*, 182 Ariz. 432, 432-444 (App. 1995) ("It is true that, in cases where there is an appeal pending, the final deadline [to file for post-conviction relief] will be unknown until the appeal is resolved and the mandate has issued."); *Owen v. Shores*, 537 P.2d 978,981 (Ariz. App. 1975) ("There was still the necessity for issuance of the Court's mandate, and for the trial court to take the necessary action to enforce the mandate...."); *State v. Febles*, 210 Ariz. 589, 592 (App. 2005)(Conviction became final on date the court issued the mandate after time for further review expired.).

Thus, looking to Arizona law, as the previously discussed cases direct this Court to do, Arizona Rule of Criminal Procedure 31.23(a) provides that, "[i]f there has been no motion for reconsideration and no petition for review filed, the clerk of the Court of Appeals shall issue the mandate at the expiration of the time for filing such motion or petition." Thus, Petitioner's Rule 32 petition was pending, as the Supreme Court has defined that term in *Carey*, until it reached final resolution upon issuance of the court of appeals mandate on November 30, 2000. Accordingly, the Petition, filed on November 28, 2001, is timely.

### 3. Equitable Tolling

Alternatively, Petitioner is entitled to equitable tolling under these circumstances.

Respondents note that the Supreme Court has not decided whether equitable tolling applies under the AEDPA, citing *Lawrence v. Florida*, 127 S.Ct. 1079, 1085 (2007) and *Pace v. DiGuglielmo*, 544 U.S. 408, 418 n.8 (2005), and do not concede that

1    it does. (Answer, at 7.) The Ninth Circuit has held that 2244(d) allows for equitable

2    tolling. *Harris v. Carter*, 515 F.3d 1051, 1055 n.4 (9th Cir. 2008). A petitioner is

3    entitled to equitable tolling of the statute of limitations if he can show: " '(1) that he has

4    been pursuing his rights diligently, and (2) that some extraordinary circumstance stood

5    in his way' and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007)

6    (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). "Equitable tolling is typically

7    granted when litigants are unable to file timely petitions as a result of external

8    circumstances beyond their direct control." *Harris*, 515 F.3d at 1055. "Equitable tolling

9    is typically denied in cases where a litigant's own mistake clearly contributed to his

10   predicament." *Id.*

11        Respondents argue that the correct standard to determine the presence of an

12   "extraordinary circumstance" can be found in *Lott v. Mueller*, 304 F.3d 918, 922 (9th

13   Cir. 2002) (Extraordinary circumstances are those circumstances "beyond a prisoner's

14   control [which] make it impossible to file a petition on time.")(citations omitted). The

15   Ninth Circuit in *Harris* noted that since the Supreme Court had decided *Pace*, the Ninth

16   Circuit had not yet settled on a standard of application. *Harris*, 515 F.3d at 1055 (citing

17   for comparison *Raspberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir.2006) and *Roy v.

18   Lampert*, 465 F.3d 964, 969 (9th Cir.2006). The court noted that the only case to

19   address the issue noted the possibility that *Pace* had "lowered the bar somewhat"

20   compared with the previous standard. *Harris*, 515 F.3d at 1055, citing

21   *Espinoza-Matthews v. California*, 432 F.3d 1021, 1026 n.5 (2005)). *Harris* did not

22   decide whether a substantive difference existed between the two standards because the

23   Ninth Circuit granted equitable tolling based on the petitioner's reliance in good faith

24   on then-binding circuit precedent in making a tactical decision to delay filing a federal

25   habeas decision, even though Harris *could* have filed a timely habeas petition. *Harris*,

26   515 F.3d at 1055.

27

28

a.      <u>Diligence</u>

Petitioner argues that she diligently pursued her rights, expeditiously exhausting state remedies, and procuring funding for counsel to pursue federal remedies. (Reply, at 13.) After present counsel was retained, counsel avows that he diligently located and obtained records from several different attorneys, reviewed extensive volumes of records, viewed evidence located both in court and at the police department, and independently investigated and prepared the necessary briefs for filing the habeas corpus petition in this in this case. (Reply, at 13, Exhibits to Reply, Ex. B.)

There is no question that Petitioner acted diligently in this matter.

b.      <u>Extraordinary Circumstances</u>

As discussed above, federal courts are to look to state law in order to determine whether a state petition for post-conviction relief is still "pending" for purposes of tolling under § 2244(d)(2). Neither case in effect at the time Petitioner filed her petition for post conviction relief in state court, *Bunney* and *Wixom,* addressed the use of the date of the issuance of an appellate court mandate *under Arizona law*.

The cases cited by Petitioner establish conclusively that, under Arizona law, a petition for post-conviction relief is pending in Arizona state courts until the date the reviewing court issues its mandate. *See Barrow*, 75 Ariz. at 220; *Lindus v. Northern Insurance Company of New York*, 103 Ariz. 160, 162 (1968) (*en banc*) ("Where the interests of justice outweigh the interest in bringing litigation to an end the court should recall the mandate."); *Sepulveda*, 201 Ariz. at 159 n.2; *Dalglish*, 183 Ariz. at 190; *Jones*, 182 Ariz. at 432-444; and *Owen*, 537 P.2d at 981.

This was not a miscalculation of the deadline, or negligence on behalf of counsel, or simple inexcusable oversight. (*See* Reply, Exhibit B.) Counsel's calculation demonstrates good-faith reliance on existing precedent and constitutes "extraordinary circumstances" under *Harris,* 515 F.3d at 1054. Accordingly, Petitioner having demonstrated diligence and extraordinary circumstances, the Magistrate Judge

finds that the time between the court of appeals decision on October 17, 2000, and the issuance of the mandate on November 30, 2000, is equitably tolled, and thus, the Petition is timely.

B.     Ground One

Petitioner argues that the trial court's exclusion of vital defense witnesses who would have testified to the decedent's prior acts of violence toward women and especially prostitutes, under circumstances similar to those in the present case, was contrary to clearly established law as determined by the United States Supreme Court and denied Gina Celaya's rights to due process, a fair trial and to present a defense, violating the 5th, 6th and 14th Amendments to the United States Constitution, with substantial and injurious effect.  (Petition, at 5.)

*1.     Precluded testimony*

Petitioner asserts that testimony from the following three witnesses was erroneously precluded by the trial court, and that this issue was raised throughout the Arizona appellate system.

a.     Jacquelin Carranza

Jacquelin ("Jackie") Carranza (aka Christie Dolan) was interviewed by the defense and the police prior to Petitioner's trial.  (Appendix, Ex. H, I.)  Ms. Carranza, a prostitute, recognized a photograph of the victim on television as a "date" of hers.  (Appendix, Ex. H, at 3.)  She had known the victim since 1988, but had most recently seen him in December, 1992.  (Id.)  Ms. Carranza stated that the first time she was with the victim, he drove her to an area "far out by the airport," and "down a dirt road ...like a dump," abused her verbally and physically, and "scared the hell" out of her.  (Appendix, Ex. H., at 4, 8.)  Ms. Carranza remembered that, during her most recent encounter with the victim, he was wearing a baseball cap, and driving a small light blue or gray pickup truck.  (Appendix, Ex. I, at 15.)  Ms. Carranza also stated that the victim

had told her about his work and his family - that he was married with two grown children, and worked in construction or the mines.  (*Id*. at 23-26.)

b.    Teresa Larrivas

Teresa Larrivas, a former prostitute, recognized the victim's photograph from the news and was interviewed by the Tucson Police Department prior to Petitioner's trial. (Appendix, Ex. J.)  Ms. Larrivas recalled encountering the victim approximately six years before the interview.  (*Id*. at 5.)  Ms. Larrivas said that the victim was Hispanic, with short hair and a mustache, and kind of heavy, drove a blue truck, with a camper on it, and always used to wear a baseball cap.  (*Id*. at 8, 12.)  Ms. Larrivas was certain of her identification, stating "I know it was him."  (*Id*. at 13.)  Ms. Larrivas remembered being picked up by the victim and being driven out of South Tucson to a place that was "just all desert."  (*Id*. at 10, 14.)  The victim informed Ms. Larrivas that he would not be paying her, and told her to get off the truck.  (*Id*. at 15-17.)  The victim grabbed Ms. Larrivas and took her to the back of the camper and raped her while she pleaded with him and struggled and told him "no."  (*Id*. at 17-18.)

c.    Francis Czybora

Ms. Czybora, who had been a bartender at Ralph's Tavern, came forward after the trial had started and testified during a proffer.  Ms. Czybora testified out of the presence of the jury that she had known the victim for 15-18 years, as a daily customer at Ralph's Tavern.  (Appendix, Ex. K, RT 9/27/94, 210-211).  Ms. Czybora knew him as a man who "liked to fight and he was very abusive to the other patrons" in the bar. (*Id*. at 214.) Ms. Czybora knew that prostitutes that went with him "come back beat up" and personally witnessed the victim slam a girl against the wall when she wouldn't go with him.  (*Id*. at 215.)  Ms. Czybora knew of several prostitutes from her work at the bar, and was told that the victim "liked to use his fist on them."  (*Id*. at 217.)  She told of one occasion in which the victim was "after" a 14 year-old girl who was waiting for her mother in the tavern.  (*Id*. at 223.)  Ms. Czybora testified that when she warned him

of the trouble he could get into with a 14 year-old he said, "Well, if they bleed, they can get stuck." (*Id.*)

### 2. *Trial Court's rulings*

#### a. Jackie Carranza

The State moved to preclude any evidence of alleged violent tendencies of the victim and that he allegedly frequented prostitutes, specifically the testimony of Jackie Dolan-Carranza and Victor Manuel. ("ROA", Doc. No. 52, Part 3, at 4.)[5] The defense argued that this information was relevant to self-defense under Ariz.R. Evid. 404(b) as to Trinidad Lopez's identity, and his state of mind, his intent, and his common plan and scheme to force sex with women he picked up on the streets, including Gina Celaya, after driving them to a secluded desert area near the dump. (*Id.*, Part 3, at 40-45; RT 5/10/94, 26-27.) The trial court granted the State's Motion to Preclude Witnesses Jackie Carranza and Victor Manuel. (*Id.*, Part 9, at 4.) The trial court found Ms. Carranza's testimony was too speculative, and any prejudicial effect would have outweighed any probative value. (*Id.*, Part 9, at 38; Part 48, R.T. 6/10/94, at 2-3, 8.) The trial court made the same finding as to Victor Manuel. (*Id.*, Part 9, at 38.)

#### b. Teresa Larrivas

The trial court initially ruled that Ms. Larrivas' testimony was relevant and admissible, (ROA, Part 9, at 37; R.T. 6/10/94, at), but reversed its ruling on admissibility just two days before trial and precluded the testimony on the grounds that Gina Celaya did not know of the acts before the shooting. (ROA, Part 15, at 1.) The

---

[5] ROA refers to the Clerk's Record in the matter of *State v. Celaya*, CR-41554. The State electronically filed the ROA in this Court's Document Numbers 52 and 53, and, because the ROA does not appear to be consecutively Bates stamped throughout, the Court will refer to this Court's docket number, part numbers and page numbers for reference to these documents.

trial court granted the State's motion to preclude testimony of Teresa Larrivas, after reviewing the statements provided by Ms. Larrivas, and found that "where self-defense is asserted, as here, then the defendant charged with homicide may be permitted to introduce evidence of specific acts of violence by a deceased <u>only</u> when those acts were personally observed by the defendant or made known to him (her) prior to the homicide." (*Id.*, Part 15, at 1-2.) (emphasis in original) (citations omitted). The trial court also held that Ms. Larrivas would not be testifying as to any general character traits of the victim, nor that the unassociated incident eight years ago constituted a "habit". (*Id.*)

c.      <u>Francis Czybora</u>

The court precluded Ms. Czybora's testimony because it was unsure she was talking about the same person and because the information was from about 7 or 8 years before Mr. Lopez' death. (RT 9/27/94 at 233-34.)

3.     *Appeal*

This Court reviews the Arizona Court of Appeals opinion as the last reasoned state court opinion. *See Ylst*, 501 U.S. at 803-04 (1991). The Arizona Court of Appeals ruled that the trial court properly excluded the testimony of Ms. Carranza and Ms. Larrivas under Rules 404(a)(2) and 405; that character could only be proved by reputation or opinion evidence, and that the trial court did not err by excluding evidence of these two instances of violent behavior. (Answer, Ex. A, at 4.) Further, the court was unpersuaded by the argument that the evidence was not character evidence but proof of a common scheme or plan to assault prostitutes. (*Id.*) The court of appeals also found the trial court properly exercised its discretion under Rule 403 by excluding Ms. Czybora's testimony, offered mid-trial, because the reputation was temporally remote, and the probative value of the evidence was marginal, and would require an expenditure of time to rebut the evidence. (*Id.*) The court of appeals denied a motion

1  to reconsider, and the Arizona Supreme Court denied a petition for review.  (Appendix,
2  Ex. B.)

3      *4.    Analysis*

4      Respondents argue that review by this Court is limited to a determination of
5  whether the admission or exclusion of the evidence in question rendered the trial so
6  fundamentally unfair so as to violate the defendant's due process rights, and that this
7  Court has no authority to review error in the trial court's application of Arizona Statutes
8  and the Arizona Rules of Evidence.  (Answer, p. 13.)

9      Respondents are correct in their assertion that a state prisoner is not entitled to
10 relief under 28 U.S.C. § 2254 unless she is held in custody in violation of the
11 Constitution, laws or treaties of the United States. *Eagle v. Isaac*, 456 U.S. 107 (1982);
12 28 U.S.C. § 2254.  "Clearly established federal law holds that 'federal habeas corpus
13 relief does not lie for errors of state law," *Lewis v. Jeffery,* 497 U.S. 764, 780 (1990),
14 and that 'it is not in the province of a federal habeas court to reexamine state-court
15 determinations on state-law questions,' *Estelle v. McGuire,* 502 U.S. 62, 67 (1991))."
16 *See also Mammal v. Van de Camp,* 926 F.2d 918, 919 (9th Cir. 1991).  A state trial
17 court's admission of evidence under state evidentiary law will form the basis for federal
18 habeas relief only where the evidentiary ruling "so fatally infected the proceedings as
19 to render them fundamentally unfair" in violation of the petitioner's due process rights.
20 *Mammal,* 926 F.2d at 919.  This means that a state prisoner challenging the correctness
21 of state evidentiary rulings has alleged no deprivation of federal rights. *Gutierrez v.*
22 *Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983) (citing *Eagle*, 456 U.S. at 118-19.)
23 Petitioner, however, asserts that the citation to state evidentiary law is necessary
24 because it is well established that a person exercising the right to present witnesses in
25 her own defense "must comply with established rules of procedure and evidence
26 designed to assure both fairness and reliability in the ascertainment of guilt and
27
28

1  innocence." (Reply, at 23)(Citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973);

2  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

3      "Whether rooted directly in the Due Process Clause of the Fourteenth

4  Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth

5  Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity

6  to present a complete defense.' " *Crane,* 476 U.S. at 690 (internal citations omitted)

7  (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  A defendant's right to

8  present a defense stems both from the right to due process provided by the Fourteenth

9  Amendment, *see Chambers,* 410 U.S. at 294, and from the right "to have compulsory

10  process for obtaining witnesses in his favor" provided by the Sixth Amendment, *see*

11  *Washington v. Texas*, 388 U.S. 14, 23 (1967) (explaining that the right to compulsory

12  process would be meaningless if the defendant lacked the right to use the witnesses

13  whose presence he compelled).

14      That right, however, is limited.  "In the exercise of this right, the accused, as is

15  required of the State, must comply with established rules of procedure and evidence

16  designed to assure both fairness and reliability in the ascertainment of guilt and

17  innocence." *Chambers*, 410 U.S. at 302.  "[S]tate and federal rulemakers have broad

18  latitude under the Constitution to establish rules excluding evidence from criminal

19  trials. Such rules do not abridge an accused's right to present a defense so long as they

20  are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' "

21  *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483

22  U.S. 44, 56 (1987)).  Although the Supreme Court has indicated its approval of "well-

23  established rules of evidence [that] permit trial judges to exclude evidence if its

24  probative value is outweighed by certain other factors such as unfair prejudice,

25  confusion of the issues, or potential to mislead the jury," *see Holmes v. South Carolina*,

26  547 U.S. 319, 326 (2006), "[i]n these circumstances, where constitutional rights directly

27  affecting the ascertainment of guilt are implicated, [evidentiary rules] may not be

28                          - 28 -

applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302. As the Ninth Circuit has explained, "the presence or absence of a state law violation is largely beside the point," the issue is whether the state proceedings satisfy due process. *Mammal*, 926 F.2d at 919-20.

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States,* 493 U.S. 342, 352 (1990). The Supreme Court has "found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308. On habeas review, the question is whether the court's refusal to admit the evidence rendered Petitioner's trial fundamentally unfair. *Jones v. Schriro*, 2008 WL 444619 (2008) (citing *Chambers*, 410 U.S. at 302-303). Petitioner argued to the court of appeals that the "trial court's rulings precluding evidence offered in support of Gina Celaya's self-defense and crime prevention defense violated her constitutional right to a fair trial, compulsory process, and her right to present a defense to the first-degree murder[] charges she faced" and cited relevant Supreme Court case law. Reply, Ex. G, at 3031, 39, 42. The court of appeals, however, did not address Petitioner's constitutional claim. Answer, Ex. B. Accordingly, the claim is reviewed de novo, because in this circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez*, 422 F.3d at 1025-26; *and Nulph*, 333 F.3d at 1056-57.

Petitioner's defense was summarized in her response to the State's motion to preclude impermissible character evidence:

> 1) [Petitioner] was walking on South Sixth Avenue; 2) the decedent stopped and offered to give her a ride; 3) due to the area of town she was in, the fact it was late at night, she agreed to take a ride; 4) the decedent did not take Gina home as promised, but took her to a wildcat dump in the desert; 5) the decedent asserted that Gina was a prostitute, and upon learning she was not, still insisted on culminating a sex act; 6) the decedent frightened Gina, put her in fear of serious physical injury and fear for her life; 7) Gina fired a gun, not knowing where she had hit the man, and only learned later that he died.

1    The prosecution's theory of the case was similarly summarized:

2        a) Gina was walking down Sixth Avenue and passed herself off as
3    a prostitute, and thereby got a ride from the decedent - or - Gina was
     walking down South Sixth Avenue and was kindly given a ride by the
4    decedent; b) after Gina entered the vehicle she lured the decedent to the
     wildcat dump in the desert with promise of a sex act - or - she forced the
5    decedent to go to the wildcat dump at the end of a gun; c) upon reaching
     the wildcat dump Gina shot and killed the decedent so as to take his
6    vehicle (a so-called truck jacking).

7        Petitioner argued the trial court's preclusion of testimony by the three witnesses

8    deprived the jury of background information about Mr. Lopez  - that on two prior

9    occasions the victim drove women he picked up as prostitutes to an isolated desert

10   location where he forcibly sexually attacked them, and that he had a reputation for

11   violence among prostitutes - that might have corroborated Gina Celaya's account of the

12   events immediately preceding the shooting which was critical to her self-defense claim.

13   (Doc. No. 49, Ex. G - Appellant's Opening Brief, at 32.)   Petitioner asserted in her

14   appellate brief that the testimony would have corroborated many aspects of her account

15   of the events leading up to the shooting, especially since there were no eyewitnesses to

16   the confrontation in the desert, including: 1) that the victim voluntarily offered her a

17   ride; 2) that through his own initiative, he drove to the isolated desert setting where he

18   was found; 3) that he did so with the intent to engage in sexual relations with her; and

19   4) that he was sexually assaultive and abusive with her when they arrived.  (Doc. No.

20   49, Ex. G, at 36-38.)

21       The State argued that evidence of this nature would only have been admissible

22   if Petitioner had known of the decedent's reputation for violence. (ROA, Doc. No. 52,

23   Part 3, at 7-9.)  Despite the Petitioner's repeated assertions that the evidence was not

24   being introduced as character evidence under 404(a) and 405, the evidentiary criteria

25   for the introduction of character evidence became the central focus of the State's

26   argument, and the State court's decision to reverse its earlier finding that Ms. Larrivas'

27   testimony was relevant and admissible, and later to affirm that decision.   Little

28

consideration was given to Petitioner's argument that the evidence was presented under 404(b) outside of the appellate court's cursory dismissal of this argument.

Respondents assert that the trial court's exclusion of evidence of the victim's character did not undermine the fundamental fairness of Petitioner's trial because "nothing in the record suggests that Petitioner knew about those alleged past acts, and Petitioner does not contend otherwise." (Answer, at 14.) As Petitioner asserted in her appellate brief, she was not attempting to have specific acts evidence admitted to prove that the victim acted in conformity therewith, she was attempting, under Rule 404(b) to have other act evidence admitted to prove what was perhaps referred to inartfully, as the victims "modus operandi" or as evidence of the victim's design, plan and intent. Under Rule 404(b), while specific act evidence is not admissible to prove the character of a person to show action in conformity with that character, it may be admissible for other purposes "such as proof of motive, opportunity, intent ..." The list of reasons is not exclusive. *State v. Jeffery*, 135 Ariz. 404, 417 (1983).

While adherence to state evidentiary rules suggests that a trial was conducted in a procedurally fair manner, and it is possible to have a fair trial even when state standards are violated, the Ninth Circuit recognizes the converse view - that state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *Mammal*, 926 F.2d at 919.

The state courts erred by failing to fully consider the admission of specific act evidence under Rule 404(b) (the testimony of Ms. Larrivas and Ms. Carranza) for the purpose of corroborating Petitioner's version of events, and to show the victim's motive and intent to sexually assault Petitioner in order to ensure a fundamentally fair trial. The State opened the door to such evidence by attacking Petitioner's credibility and by arguing that Petitioner was a family man who was not intending to sexually assault Petitioner, but was merely giving her a ride home.

The State Courts did not identify or apply clearly established Supreme Court law guaranteeing the right to present a defense. *See Chambers*, 410 U.S. at 302; *Washington*, 388 U.S. at 19; *Crane*, 476 U.S. at 683. The State Courts relied instead on the mechanistic application of evidentiary rules to find that the trial court properly excluded the witnesses.

"Even relevant and reliable evidence can be excluded when the state interest is strong," and then "only the exclusion of critical, reliable and highly probative evidence will violate due process." *Perry v. Rushen*, 713 F.2d 1447, 1450, 1452 (9th Cir. 1983). As the state interest weakens, less significant evidence is protected. In light of this record, Respondents have identified no state interests that would compel this Court to exclude the evidence at issue.

The trial court's concerns, that it would take time to rebut the evidence and that the evidence was temporally remote, and the appellate court's concern with the reliability of Ms. Czybora's identification, are minor, particularly since the jury heard evidence that the decedent was a decent "grand-fatherly person" and that the prior bad acts of Petitioner were presented through the testimony of Magdalena Laguna and Jessica Vega. Principles of basic fairness and due process require that Petitioner be allowed to present evidence that would corroborate her key theory of the defense, that the decedent had attacked Petitioner before she pulled the gun in self defense. It is in cases like this that a "collateral issue, such as credibility, may be important and yet nonetheless must sometimes be subordinated to the need of the factfinder to hear relevant evidence." *Arredondo v. Ortiz*, 365 v. 778, 788 (9th Cir. 2002) (Kozinski, J. concurring).

Additionally, the introduction of the testimony of the three witnesses was not presented in a vacuum. Although the preclusion of three other witnesses is not at issue in this habeas, the facts presented by the pretrial proceedings are relevant to the trial court's decision to preclude the witnesses at issue, and only bolster the relevance and

reliability of the proffered testimony. The defense apparently interviewed two sisters, Lois Garcia and Pauline Nassewtewa. They claimed to have known Mr. Lopez from the Hideout bar and told of his violent and abusive acts toward women. (ROA, Part 48, RT 6/10/94, at 11-12.) The trial court noted its intention to preclude these witnesses for the same reasons the court was applying as to Ms. Carranza, (*id.* at 12), but the record seems to indicate that the defense was ultimately unable to produce them for timely interviews or trial, despite a subpoena that is in the record. (ROA, Part 46, RT 6/3/94 at 17; Part 9, at 61-62.)

Similarly, the defense found and interviewed a former prostitute named Tracy Stewart. She stated that Mr. Lopez took her out to a desert area near a dump and had sex with her. Her complaints were that he was too cheap, and took too long to complete the sex act. The transcript of her interview is contained in the Appendix to the original Memorandum filed on November 28, 2001 as Exhibit F. Again, however, the record contains hints that the defense was having trouble locating her before trial (ROA, Part 48, RT 6/10/94 at 14) and she was ultimately not called as a defense witness despite the lack of a formal ruling on the state's motion to preclude her.

A third witness in this category was Victor Manuel. He gave the defense a statement in which he said that Mr. Lopez had aggressively tried to "pick him up" for a "ride home" as he was walking on South Sixth Avenue at night. (Appendix, Ex. G.) Mr. Manuel stated that he declined the offer but Mr. Lopez kept circling back until Mr. Manuel had to hide behind a trash can near a restaurant. (Id., at 4.) The trial court ultimately precluded testimony from Mr. Manuel because he failed to appear for an interview by the State. (RT 6/3/94 at 16.) The defense did not appeal any of the court's rulings regarding Lois Garcia, Pauline Nassewtewa, Jackie Stewart or Victor Manuel.

The testimony of the precluded witnesses at issue in this habeas was both consistent with the testimony of each of the other two witnesses, and, additionally, consistent with the testimony of these four additional witnesses. The exclusion of this

relevant and vital testimony was fundamentally unfair, particularly as the strength of testimony is balanced against the State's very minor interests in excluding the testimony.

The prejudicial impact of any constitutional error is assessed by asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (*quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112 (2007) (holding that the *Brecht* standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

Evaluating the excluded testimony in the context of the entire record, the Court finds that its exclusion had a substantial and injurious effect on the verdict in Petitioner's case. The specific facts Petitioner provided to Detective Thompson about the victim's conduct immediately after the shooting were strikingly similar in many respects to the proffered evidence, which Petitioner did not know about when she made the statements, and would have corroborated her version of events. There was no other witness to the shooting, and the State contested the credibility of the Petitioner's statements, suggesting the accusation of a sexual assault was made up in response to the detective's suggestion. The effect of precluding these witnesses was especially potent in light of the presentation of Petitioner's own prior bad acts through the witness Magdalena "Baby" Laguna, and Jessica Vega. The trial court described the evidence against Petitioner as "overwhelming," consisting of Petitioner's own friends and acquaintances testifying that Petitioner herself told them that she killed the victim in order to steal his truck. The trial court summarized the trial testimony as follows:

> **Sonya Georgina Leyva** (Age 18 on date of trial) - testified that she overheard Gina and Baby Laguna talking about Gina killing a guy. She overheard them say that Gina stole the decedent's truck. (9/22/4 Trial Transcript, p.49). Gina asked her if she wanted to go to California with them in the truck. (9/24/94 Trial Transcript, p.35).

**April Ornelas** (age 15 on date of trial) - Gina told her she shot the man at Valencia, near the airport; Gina shot the man in order to get his car; (9/24/94 Trial Transcript, ¶ 78-80). She observed Gina with a gun the day after the shooting loading the gun and handing it to Baby Laguna who fired at pursuers. (9/24/94 Trial Transcript, p.74).

**Rebecca Antone** - (Age 15 on date of trial) - Gina's good friend. Gina called her numbers of times the day after the murder to tell her "she had a truck" and to invite Rebecca to go "cruising around" town with Gina in the truck. (9/24/94 Trial Transcript, p.92-92). Gina told Rebecca that she had stolen the truck. (9/24/94 Trial Transcript, p.95). Gina specifically told Rebecca that she shot the owner of the truck on Valencia by the airport. This conversation occurred in Rebecca Antone's room in the presence of the other girls. (9/24/94 Trial Transcript, p.96). She testified that she saw Gina carrying a gun that day in a blue pouch (9/24/94 Trial Transcript, p.98).

**Gloria Espinosa** - (age 16 on date of trial) - Gina and Baby pull up in the truck next to Gloria and April while they're walking. Gina invites them to go cruising in the truck. They were planning on going to California. (9/24/94 Trial Transcript, ¶. 113-114). She saw Gina with the gun. (9/24/94 Trial Transcript, ¶. 117-119). She testified as follows:

> "Well, when we got to Rebecca's house and we had crashed, April had asked Gina where she got the truck from, and Gina told her that she killed Trinidad and got the truck from him." (9/24/94 Trial Transcript, p.119 Lines 6-9). Gina said she killed the man because she wanted the truck. (9/24/94 Trial Transcript, p. 120).

**Baby Laguna** - (age 16 on date of trial) - She testified that she and Gina had previously stolen a car and gone to California. (9/24/94 Trial Transcript, ¶. 253-254). Just prior to the murder, she testified that Gina came to her home with a gun, asked Baby to help her unstick the gun, and asked Baby to go with her because she wanted to get a car. (9/24/94 Trial Transcript, ¶. 255-259). Baby told Gina she was sick and could not go with Gina. Baby's mother told Gina to leave. (9/24/94 Trial Transcript, p.259). The next day, Gina showed up at Baby's house with the truck. (9/24/94 Trial Transcript, p. 262). When she asked Gina

whose truck it was, Gina told her she shot some guy. (9/24/94 Trial Transcript, p. 264). She testified that Gina told her that she pretended that she was a prostitute and the guy picked her up and they went over by the desert. She testified that they were outside in the desert when she shot the man. She testified that Gina drove by the area where she had shot the man to show Baby. (9/24/94 Trial Transcript, ¶. 267-271). Gina told Baby that she got nineteen dollars from the man. She said the man begged her not to kill him. (9/24/94 Trial Transcript, ¶. 271-273). They were planning to drive the truck to California or Bisbee. (9/24/94 Trial Transcript, ¶. 19-20). While the above mentioned girls and Gina were at Rebecca's house, Gina tole the three girls and Baby "that she had shot some man, and that they had better not say nothing." She told them the man she shot was the owner of the truck. She saw Gina with the handgun in the blue bank bag. (9/24/94 Trial Transcript, ¶. 26-28).

...

... With regard to her cross-examination of Baby Laguna, [defense counsel] impeached Ms. Laguna with regard to her immunity, the fact that she had committed numbers of crimes for which she was not being prosecuted, that she had imagined and made up her testimony in order to avoid getting into trouble, and impeached her with numerous prior inconsistent statements.

Exhibits to Second Amended Memorandum of Points and Authorities to Petition for Writ of Habeas Corpus, Ex. 8, Minute Entry, October 24, 2003, p. 16-17.)[6]

Without the testimony of the three witnesses, there was very little reason for the jury to believe Petitioner's version of events. The testimony of those witnesses would have drastically altered the juries perception of what happened the night Mr. Lopez was

---

[6] Transcripts of the trial in its entirety were not submitted to this Court with the ROA. This characterization of trial testimony is obtained from the trial court's minute entry denying Petitioner's First Rule 32 Petition. (Doc. No. 37, Ex. 8.). Having failed to submit complete transcripts along with their supporting memorandum, either party may file objections to this Court's factual summarization of the testimony, along with supporting documentation, to be included in the objection or response filed to this Report and Recommendation.

shot. There is no question that Petitioner admitted she shot the victim and took his truck. If Petitioner had presented testimony that corroborated her version of events, there is a strong chance the jury may have chosen to believe that while what happened before and after the events which occurred in the desert may have been an exercise in extremely poor judgment as well as a complete disregard for human life by Petitioner, that Petitioner's friends were lying, or Petitioner was lying when she told her friends how she obtained the truck.

The State Court's denial of relief for the violations of Due Process, Compulsory Process, the right to present evidence and the right to a fair trial rendered Petitioner's trial fundamentally unfair and was contrary to clearly established law and had substantial and injurious effect or influence in determining the jury's verdict. Accordingly, the Magistrate Judge recommends that the District Court grant relief as to Ground One of the Petition.

C.     Ground Two

Petitioner argues that the trial court's refusal to admit Petitioner's tape recorded statement after the State used it to impeach her was contrary to clearly established federal law and violated her constitutional right to due process of law, fair trial, and to present a defense, as she was entitled to introduce this evidence under Ariz. R.Evid. 106.

1.     Relevant facts

The relevant facts are taken from Petitioner's memorandum, and are essentially uncontested:

Tucson Police Detective Thomson interrogated Gina Celaya following her arrest at 4 a.m. on the morning of the day after the shooting. He obtained two brief tape-recorded statements. (RT 9/14/94 at 5-41; State's Exhibits 163 and 164 copies of which are included as Exhibits L (24 pages) and M (5 pages) in the Appendix to the original Memorandum filed on November 28, 2001.) Gina Celaya was unaccompanied by an

adult or an attorney when she gave those statements. (ROA, Part 54, RT 9/14/94 at 14.) At first Gina denied knowledge of the shooting but after the detective asked her whether the man had tried to harm her, and told her that this was her chance to say so, she admitted that she had shot him after he attempted to sexually assault her. (Appendix, Ex. L at 1-10.)

Before trial, the State obtained an order prohibiting the defense from introducing the taped statements, which it characterized as self-serving hearsay. The State stipulated that it would not introduce evidence of Gina Celaya's statements during its case-in-chief. Although the prosecution did not introduce Gina Celaya's statements to Detective Thomson in its case-in-chief, during cross-examination the prosecutor extensively used portions of the taped statements to impeach Gina's direct testimony. (ROA, Part 63, RT 9/27/94 at 169-189.) The usage of the taped statements was wide-ranging and covered many topics including the following: the actions Miss Celaya took when she reached the desert (*id*. at 169-171); whether she told Detective Thomson that she shot the man because he laughed at her (*id*. at 172); whether she took the safety off the gun before shooting (*id* at 171); whether Trinidad Lopez was coming at her when she shot him (*id*. at 173); whether Detective Thomson was the first person she told that Trinidad Lopez had tried to hurt her (*id*. at 175, 179); whether Miss Celaya denied taking the truck during the initial portion of the statement (*id*. at 180); what she told Detective Thomson about who owned the gun (*id*. at 185); whether Detective Thomson told her that Baby said the man thought she was a prostitute (*id*. at 189); and whether it was Gina's or the detective's decision to talk off-tape. (*id*. at 189) These questions covered the crucial area of the events preceding and during the shooting. The prosecutor's questions were culled from every portion of Miss Celaya's tape-recorded statements.

The cross-examination use of the tapes covered the issue of the origin of the self-defense claim and whether Detective Thomson planted the idea of self-defense in Gina's mind which she then fabricated.

> Q.    Okay. Now, when Detective Thomson said to you on Page 10 of your statement -- you want to make sure that you remember what your answer was now -- Detective Thomson said -- asking you if you killed him in self-defense, and later on do you remember what you told him at that point?
>
> A.    Yeah.
>
> Q.    What did you tell him?
>
> A.    I told him what he tried to do.
>
> Q.    No, that's not true. Read what it says there, your very first answer.
>
> A.    Where I said I didn't kill nobody?
>
> Q.    You told him you didn't kill nobody?
>
> A.    Yeah.
>
> Q.    Later on in the court: "Judge, I shot him because he tried to hurt me." I am giving you that opportunity right now. What did you say? "Did this man hurt you." And what did you say?
>
> A.    Yeah.
>
> Q.    Right. And that's the first time that you ever mention to anyone that this man tried to hurt you in any way?
>
> A.    That's the first time, yes.

*Id.*, RT 9/27/94, 183-184.

On redirect examination, defense counsel read a brief portion of one of Gina's answers during the interrogation into evidence, and elicited Gina's testimony that she had told Detective Thomson about the details of what had occurred in the desert and on the drive out. (*Id.*, RT 9/27/94 at 190-195). Then, near the close of the defense case, the defense moved to play portions of the tape-recorded statements for the jury in order

- 39 -

to place Gina's statements in context following the impeachment that occurred during cross-examination.  (RT 9/28/94, 35.)[7]  Defense counsel argued:

> What happened in cross-examination after Ms. Celaya testified, the State asked her a whole series of questions taken from one page and another page, and attempted to impeach her, without the jury able to hear the context in which they were played. And I think that in the interest of fairness, I should be allowed to play a portion of the tape.

*Id.* at 35-36 (emphasis added).

The prosecution objected on hearsay grounds to playing the tape.  The trial court denied without explanation the motion to play the tape of pages 10-24 of Ms. Celaya's initial statement and ruled that the portion of the second statement would not be admitted because the witness had been "adequately rehabilitated." (RT 9/28/94, 39-40.)

During rebuttal closing argument, the prosecutor argued, over defense objection, that defense counsel could have put in the evidence of the statements if she had wanted the jury to hear them.  (RT 9/28/94,160.)  The prosecutor argued to the jury that Miss Celaya could have testified about "everything else" she said, or that the defense could have called Detective Thomson to introduce the statements.  (RT 9/28/94, 160.)  The court overruled defense objections.  *Id.*  The prosecutor argued to the jury that she was "not obligated to put on the defendant's lies." *Id.*

   *2.  Appeal*

The Court of Appeals affirmed the trial court's decision to not allow defense counsel to play sections of defendant's taped statements to the jury. (Appendix, Ex. B.)

---

[7]     Again, this portion of the trial transcript is missing from the ROA. This characterization of trial testimony is obtained from Petitioner's Second Amended Memorandum of Points and Authorities to Petition for Writ of Habeas Corpus (Doc. No. 31.). Objections to this characterization of the record due to failure to submit trial transcripts may be raised in objections to this Report and Recommendation.

The appellate court found Rule 106 of the Arizona Rules of Evidence inapplicable in that context.  Rule 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The Court of Appeals found that, by its terms, the rule applies only when proof is made through introduction of a statement, and not through impeachment through prior inconsistent statements.  (Appendix, Ex. B., at 2-3.)   In the context of impeachment, the court found that the risk of misleading the trier is avoided by the ability of the witness to correct misperceptions by present testimony, rather than past hearsay; and that this was in fact what defense counsel did on redirect.  (*Id.*, at 3.)

The appellate court found that, as to Petitioner's second argument, that the prosecutor engaged in misconduct in saying that the defense could have introduced defendant's prior statements, the state was responding, improperly, to defense counsel's arguments that the jury could infer from the failure of the state to introduce defendant's pretrial statements that they were adverse to the state.  The appellate court found that the state's improper response to the improper arguments was harmless because it "at best neutralized an impermissible inference sought to be exploited by the defense." (*Id.*)

3.    *Analysis*

This court will not review the court of appeals' determination that the rule of completeness was inapplicable in this situation, since that is a question of Arizona evidence law. Instead, this court must again determine if the evidentiary ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. The relevant Supreme Court precedents are those discussed above. An evidentiary ruling would be unconstitutional if it "so infused the trial with unfairness as to deny due

process of law." *Estelle*, 502 U.S. at 75. Moreover, such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes [the rule is] designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

The Arizona Court of Appeals considered the application and purpose of the rule and explained:

> The rule exists to prevent misleading the trier by introducing only a portion of a statement when other parts of the statement indicate that the portion sought to be introduced distorts the meaning intended. By its terms it applies only when proof is made through introduction of a statement. It ought not apply to impeachment through prior inconsistent statements. The risk of misleading the trier is avoided by the ability of the witness to explain her prior statements, why she made them, and what she meant. Distortion, in short, is prevented by the opportunity to correct misperceptions by present testimony rather than past hearsay. ... "In fairness" therefore, the consistencies need not be considered contemporaneously with the inconsistencies.

(Appendix, Ex. B.)

Petitioner asserts that, during rebuttal closing argument the prosecutor "made matters even worse," misleading the jury by arguing that defense counsel could have put in the evidence of the statements if she had wanted the jury to hear them. The court overruled defense objections. The appellate court considered the argument that the prosecutor engaged in misconduct, while initially plausible, ultimately unavailing because of the context in which the statement was made. (*Id.*)

Although the Petitioner cites several Supreme Court cases in her Petition, it cannot be said, under the AEDPA, that there is "clearly established" Supreme Court precedent addressing the issue before this Court. This Court has found no case wherein the Supreme Court addressed the constitutionality of the "rule of completeness" nor has the Supreme Court extended the protections of the Due Process Clause, the Compulsory Process Clause or the Confrontation clause to a trial court's exclusion of a defendant's otherwise inadmissible statement to rehabilitate a defendant after impeachment.

In an analogous case however, the Supreme Court held that "an essential component of procedural fairness is an opportunity to be heard. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). In *Crane*, the Supreme Court found that the Kentucky courts erred in foreclosing petitioner's efforts to introduce testimony about the environment in which the police secured his confession. *Id.* at 691. The Court opined that evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility and that such evidence was especially relevant in the rather peculiar circumstances of this case, in which the Petitioner sought to paint a picture of a young, uneducated boy who was kept against his will in a small, windowless room for a protracted period of time until he confessed to every unsolved crime in the county, including the one for which he stood convicted. *Id*. The Court reversed the conviction, holding that the introduction of evidence of the physical circumstances that yielded the confession was "all but indispensable to any chance of its succeeding" especially since neither the state court nor the respondents had advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence. *Id.*

Although this Court cannot extend the specific legal principal announced in *Crane* to the facts of this case, this Court finds that the circumstances of the trial court's mechanistic application of Rule 106 to exclude Petitioner's statements, presented out of context by the State, although damaging to Petitioner's case, would not, for reasons cited by the appellate court, rise to the level of the *Brecht* "substantial and injurious" standard. *See* 507 U.S. at 637.

Upon review of the record in this case, the Magistrate Judge finds that the ruling was not contrary to nor an unreasonable application of clearly established federal law as announced by the United States Supreme Court. Accordingly, the Magistrate Judge recommends that the District Court deny relief as to Ground Two of the Petition.

D.  Ground Three

Petitioner raises nine claims of ineffective assistance of trail counsel pursuant to the sixth and Fourteenth Amendments to the United States Constitution as determined by the United States Supreme Court. *Strickland v. Washington*, 466 U.S. 668 (1984). Respondents assert that these claims are barred from federal habeas review because the state court found them precluded under state law.

1.  *Relevant facts*

On February 20, 2002, Petitioner filed her second petition for post-conviction relief, raising claims of ineffective assistance of counsel and one claim, in the alternative, of a change in the law. (Second Amended Petition, Supp. Ex. 1.) On October 24, 2003, the trial court denied the petition with regard to all assertions of ineffective assistance of trial counsel, finding the claims precluded. (*Id.*, Supp. Ex. 8, at 13.)

2.  *Appeal*

In a memorandum decision filed August 22, 2006, the court of appeals granted review, but denied relief. (*Id.*, Supp. Ex. 14.) The court of appeals held that "the decision by [Petitioner's] first Rule 32 counsel not to assert any claims of ineffective assistance of trial counsel in that proceeding constituted a waiver of those claims in subsequent proceedings and that [Petitioner's] personal knowledge and informed consent were not necessary to effect the waiver." (*Id.*) The appellate court explicitly found that the acts and omissions by trial counsel that Petitioner was raising as an IAC claim did not involve or affect any such basic or personal rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial that would require a knowing, voluntary and intelligent waiver. (*Id.*)

Petitioner filed a petition for review of the appellate court's decision with the Arizona Supreme Court, urging the supreme court to find that the claims were not

precluded unless they were knowingly, intelligently and voluntarily waived. (*Id.*, Supp. Ex. 15, at 7) The supreme court denied review on June 5, 2007. (*Id.*, Supp Ex. 16.)

3.    *Analysis*

If a state court expressly applied a procedural bar when a petitioner attempted to raise the claim in state court, and that state procedural bar is both "independent" and "adequate"--review of the merits of the claim by a federal habeas court is barred. *See Ylst,* 501 U.S. at 801 ("When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court.") (*citing Wainwright v. Sykes*, 433 U.S. 72, 87- 88 (1977) and *Murray v. Carrier*, 477 U.S. 478, 485-492 (1986)). A state procedural default rule is "independent" if it does not depend upon a federal constitutional ruling on the merits. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002). A state procedural default rule is "adequate" if it is "strictly or regularly followed." *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 262-53 (1982))

Moreover, if a state court applies a procedural bar, but goes on to alternatively address the merits of the federal claim, the claim is still barred from federal review. *See Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.... In this way, a state court may reach a federal question *without sacrificing its interests in finality, federalism, and comity.") (citations omitted); Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003) ("A state court's application of a procedural rule is not undermined where, as here, the state court simultaneously rejects the merits of the claim.") (*citing Harris*, 489 U.S. at 264 n. 10).

Petitioner asserts that the IAC claim is not procedurally barred in this Court because the preclusion rule was unclear at the time it was supposedly broken. (Petition,

at 31.)  Petitioner asserts that the relevant time frame for consideration is the period when first-PCR counsel supposedly "broke" the rule - somewhere between November of 1994 and August of 1998.

The rule of preclusion by waiver for ineffective assistance of counsel claims not raised in previous Rule 32 proceedings existed both prior to and during the relevant time period at issue.  In *State v. Conner*, 163 Ariz. 97, 786 P.2d 948 (1990), in a second post-conviction relief proceeding, the defendant raised, for the first time, ineffective assistance of counsel at trial. *Id*. at 99-100. The Arizona Supreme Court held that the issue was waived and the defendant was precluded from raising it. *Id*. at 100; *see also State v. Pac*, 175 Ariz. 189, 190-91, 854 P.2d 1175, 1176-77 (App.1993) (finding issues waived because they could have been raised in a prior post-conviction relief proceeding or on direct appeal).  In 1995, the Arizona Supreme Court referred to this as "the usual rule[] of preclusion."  *Krone v. Hotham*  181 Ariz. 364, 366 (1995).

Rule 32.2(a) of the Arizona Rules of Criminal Procedure constitutes an independent state law ground, *see Stewart*, 536 U.S. at 860, and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its preclusion rules such that they are an adequate bar to federal review of a claim. *See Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir.1998) (finding Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir.1997) (same).

Petitioner asserts that, had the rule been clear, the United States Supreme Court would not have had to certify a question to the Arizona Supreme Court asking how the rule worked, as it did in *Stewart v. Smith*, 534 U.S. 157 (2001).  The certified question posed to the Arizona Supreme Court, however, asked how the rule worked at the time the state court had ruled on respondent's claim - *in 1995* - three years before the relevant date in this case.  *See Stewart v. Smith*, 534 U.S. 157 (2001).

Petitioner concludes by stating that the comment to Rule 32.2(a), as it was updated in 1996, "told practitioners (both judges and lawyers) that if trial errors were

'egregious' enough they would not be precluded in successive PCR proceedings. The resultant confusion interfered with a fair opportunity to seek relief on such claims in state court." *See* Petition, p. 36. This conclusion errs in both law and fact.

First, the comment to Rule 32.2 updated in 1996 reads in relevant part:

> "[t]he pre-1992 version of Rule 32.2(a)(3) indicated that a defendant must "knowingly, voluntarily and intelligently" not raise an issue at trial, on appeal, or in a previous collateral proceeding before the issue was precluded. [citation omitted] While that is the correct standard of waiver for some constitutional rights, it is not the correct standard for other trial errors. Accordingly, some issues not raised at trial, on appeal, or in a previous collateral proceeding may be deemed waived without considering the defendant's personal knowledge, unless such knowledge is specifically required to waive the constitutional right involved. If an asserted claim is of sufficient constitutional magnitude, the state must show that the defendant "knowingly, voluntarily and intelligently" waived the claim. For most claims of trial error, the state may simply show that the defendant did not raise the error at trial, on appeal, or in a previous collateral proceeding, and that would be sufficient to show that the defendant has waived the claim.

This comment to the Rule put attorneys on notice, even prior to *Smith*, that the "knowing, voluntary and intelligent" standard of waiver was not the correct standard for all trial errors. A review of State law as cited above indicates that courts had been applying a preclusion by waiver through a failure to raise the claim in a prior petition standard for ineffective assistance of counsel claims, and there is no reason to believe that this rule or comment did anything more than reinforce the notion that if you failed to raise an issue that was not "of sufficient constitutional magnitude" then the issue would be deemed waived without consideration of the defendant's personal knowledge.

Factually, it is not accurate to say that any "resultant confusion" caused by the commentary interfered with Petitioner's opportunity to seek relief on such claims in state court. Petitioner's counsel who represented her in her first PCR testified that she chose not to raise issues of ineffectiveness because of their limited success (Supplemental Ex. 7, at 135) and/or because she did not spot any of the ineffective assistance of counsel claims raised in the second PCR. (Supplemental Ex. 7, at 137-

139).  Petitioner's counsel discussed with Petitioner that she would not be raising any ineffective assistance of counsel claims, but acknowledged that had counsel been aware of the facts that were developed at the second PCR hearing, she would have filed a Rule 32.  (Ex. 7, at 138-140.)

Finally, Petitioner urges this Court to consider that Ariz.R.Crim.P. 32.4(c) required the appointment of counsel for a first IAC claim in a second PCR case until the rule was changed in the year 2000.  The rule stated:

> Upon the filing of a timely notice in a capital case, or the first notice in a non-capital case, or the second or subsequent notice in a non-capital case, which, for the first time, raises a claim of ineffective assistance of counsel, the presiding judge shall appoint counsel for the defendant within 15 days if requested . . .

It does not necessarily follow from the pre-2000 version of Rule 32.4 that Arizona law contemplated that IAC claims involving egregious trial error could be raised in a second PCR case.  A second or subsequent notice invoking ineffective assistance of counsel may, or may not have been raising claims of trial error, for instance, the second PCR may raise IAC claims as to appellate counsel or as an exception to the preclusionary rule which would allow a notice of post conviction relief of right or notice of appeal outside of the limitations period to be filed under Rule 32.2(b).

The court in *Smith* recognized what was required of a defendant, at the time Petitioner filed her claim, to avoid preclusion of a claim of ineffective assistance of counsel: she must show a constitutional right is implicated, one that can only be waived by a defendant personally. 202 Ariz. 446. The court noted some of the relatively few rights that can be so characterized. *Id*., citing *State v. Moody*, 192 Ariz. 505, ¶ 22 (1998) (waiver of right to counsel); *State v. Butrick*, 113 Ariz. 563, 566 (1976) (waiver of right to jury trial); *State v. Smith*, 197 Ariz. 333, ¶ 17 (App.1999) (right to twelve-person jury); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973) ( "Almost without exception, the requirement of a knowing and intelligent waiver has

been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial."); *cf. State v. Lee*, 142 Ariz. 210, 215, 689 P.2d 153, 158 (1984) (although "certain basic decisions have come to belong to an accused," such as "[t]he ultimate decisions on whether to plead guilty, whether to waive jury trial, and whether to testify," "the power to decide questions of trial strategy and tactics," including what witnesses to call at trial, "rests with counsel"). An alleged violation of the general due process right of every defendant to a fair trial, without more, does not save such claim from preclusion.

Accordingly, the Magistrate Judge finds that the State court's preclusionary ruling is an independent and adequate procedural bar. Because the procedural bar is adequate and independent, federal review of this claim is foreclosed unless Petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. The Magistrate Judge finds no cause to excuse the procedural default. There was no objective factor external to the defense which impeded Petitioner's efforts to comply with the State's procedural rule, Petitioner merely failed to raise the issues in her first Rule 32. Federal review of this claim is barred.

///
///
///
///
///
///
///
///
///
///
///

## IV.    RECOMMENDATION

This Court recommends that the District Court **DISMISS** claims Two and Three of Petitioner's Second Amended Petition for Writ of Habeas Corpus.

This Court further recommends that the District Court **GRANT** Petitioner's request for relief as to Ground One, and remand this case to the state court for a new trial.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within ten days after being served with a copy thereof. Fed.R.Civ.P. 72(b).   If objections are filed the parties should use the following case number: **CIV 01-0622-TUC-DCB**.

DATED this 26th day of August, 2009.


_____
Bernardo P. Velasco
United States Magistrate Judge